USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/02/2024

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

ALEXANDRE BARBIER,

                    Plaintiff,

         - against -

GINA M. RAIMONDO, Secretary,
U.S. DEPARTMENT OF COMMERCE,

                Defendant.

-------------------------------------------------------------X

22-CV-9074 (RWL)

**DECISION AND ORDER:
MOTION FOR SUMMARY JUDGMENT**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Alexandre Barbier ("Plaintiff" or "Barbier"), who worked for the United States Census Bureau (the "Census Bureau"), brings this case against his former employer, the U.S. Department of Commerce ("Defendant" or the "Government"), alleging disability discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 et seq. (the "Act"). Barbier alleges that after injuring his shoulder, the Government failed to provide him with a reasonable accommodation and terminated him because of his disability. The Government has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Government argues that Barbier accommodated Barbier's requests for a flexible work schedule that would enable him to attend medical appointments and to take personal phone calls related to his medical care and insurance. Additionally, the Government asserts that Barbier was not otherwise qualified for his position and that he was terminated for poor performance and disruptive behavior. For the following reasons, the Government's motion is granted.

## FACTUAL BACKGROUND[1]

### A.    Barbier's Employment At Census

On June 24, 2019, Barbier began working as a temporary Geographer for the Census Bureau in New York to assist with the 2020 Decennial Census.[2] (Pl. 56.1 ¶¶ 1-2; Gitlin Decl. Ex. 5 at ECF 3.)  His primary duties included developing maps and tables, and providing customer support to state and local governments who were participating in programs to improve census address and boundary data.  (Pl. 56.1 ¶ 3.)  He also provided telephone assistance to partnerships and other groups concerning isometric and analytical data.  (*Id*. ¶ 4.)  Barring any changes, his position was to end September 30, 2020.  (*Id*. ¶ 5.)  Barbier's first line supervisor was Zoe Ritter.[3]  (*Id*. ¶ 6.)  At the beginning of his employment and thereafter, Barbier, like other members of the Geography team, received training in Census Bureau procedures, as well as many program references, detailed program guides, and policies.  (*Id*. ¶¶ 19-22.)

---

[1] The factual background is based on Defendant's Statement Of Undisputed Material Facts Pursuant To Local Rule 56.1 at Dkt. 49 ("Def. 56.1"); Plaintiff's Responses To Defendant's Local Rule 56.1 Statement And Plaintiff's Local Rule 56.1(b) Statement Of [Additional] Material Facts at Dkt. 52 ("Pl. 56.1"); The Government's Response To Plaintiff's Local Rule 56.1 Counter Statement Of [Additional] Material Facts at Dkt. 55 ("Def. 56.1 Resp."); and the Declaration Of Andrew Gitlin at Dkt. 50 ("Gitlin Decl.") and exhibits thereto.  Pursuant to the standard for summary judgment, the Court resolves all ambiguities and draws all reasonable inferences in favor of Barbier as the nonmoving party.  The facts are undisputed unless otherwise noted.

[2] Barbier had also worked in different roles for the Census Bureau from April 2010 to 2014.  (Pl. 56.1 ¶ 1; Gitlin Decl. Ex. 2 at ECF 31, Tr. 30:14-31:24, 44:4-7.)

[3] Ritter began working at the Census Bureau in September 2017 and became a Supervisory Geographer in October 2018.  (Def. 56.1 Resp. ¶ 58.)

**B.    Barbier's Injury And Request For Accommodation**

One week before starting at Census, Barbier injured his shoulder and could not lift his arm above his shoulder.  (*Id.* ¶ 7; Def. 56.1 Resp. ¶ 61.)  Although the injury did not require surgery, Barbier undertook physical therapy and was directed to keep his arm in a sling.  (Pl. 56.1 ¶ 8; Gitlin Decl. Ex. 2 at ECF 56, Tr.55:23-56:14.)  Even with a sling, he experienced pain for about two months after which it began to subside.  (Def. 56.1 Resp. ¶ 62.)  According to Barbier, dressing and undressing were painful; he "could not relax his … constantly tense body;" and "sudden moves were painful."  (*Id.* ¶¶ 63-65.)  He could not use his left hand to operate a computer mouse, and he had difficulty reaching for objects.  (*Id.* ¶ 65.)

Upon beginning at the Census Bureau in 2019, Barbier, wearing his sling, told Ritter that he had suffered a shoulder injury.  (Pl. 56.1 ¶ 9; Def. 56.1 Resp. ¶ 60; *see also id.* ¶ 66 (Ritter was aware that Barbier's arm was in a sling).)  At times, Barbier told Ritter that he had pain in his shoulder and that he had difficulty speed typing (although, as Ritter explained, "[t]yping speed was not an issue in Barbier's job").  (Def. 56.1 Resp. ¶ 67.)  Ritter did not know that Barbier had a "disability" (Gitlin Decl. Ex. 3 at ECF 3), and Barbier did not make a formal written request for disability accommodation (Pl. 56.1 ¶ 10).  Barbier, did, however, ask Ritter for two accommodations:  (1) a flexible work-schedule so that Barbier could attend medical appointments; and (2) permission to take personal calls for medical and insurance reasons at his desk during work hours.  (*Id.* ¶¶ 11, 14.)

The department in which Barbier worked allowed flexible scheduling as a general practice.  Barbier thus was permitted a flexible schedule and accommodation of his need

to attend medical appointments.  (*Id.* ¶¶ 12-13, 51.[4])  Barbier could come and go to the office in whatever manner worked best for his schedule.  (Gitlin Decl. Ex. 2 at ECF 77, Tr. 76:11-14.)  When Barbier made specific requests to leave for a medical appointment, those requests were granted.  (*Id.* at ECF 78, Tr. 77:3-16.)

As for engaging in personal calls, Barbier was permitted to do so but, in mid-July, Ritter directed him to make such calls away from his desk.  (Pl. 56.1 ¶ 15; Gitlin Decl. Ex. 5 at ECF 4 (Barbier admitting that "[t]here was no objection to the calls, only to staying at my desk"); *id.* Ex. 2 at ECF 105, Tr. 104:2-8.)  More specifically, Ritter explained to Barbier that "it would be unreasonable to permit him to make personal calls at his desk because he worked in an 'open office' bullpen without cubicles or walls, and employees' workstations were only three feet apart from one another."  (Pl. 56.1 ¶ 16.)  Ritter therefore asked Barbier, and reminded the entire department (Gitlin Decl. Ex. 3 at ECF 4), "to take any personal calls in the 'lobby' area outside the bullpen so as not to disturb other employees" (Pl. 56.1 ¶ 17).  Barbier started to do so but still engaged in some personal calls at his desk notwithstanding Ritter's directive.  (*Id.* ¶ 18.)  According to Barbier, his injury made it difficult to take papers with him to the lobby area and take notes there. (Gitlin Decl. Ex. 1 at ECF 8.)  Some of his calls were lengthy, lasting up to 45 minutes or

---

[4] In responding to the Government's 56.1 Statement of Material Facts, Barbier often "objects to the accuracy" of a statement but does not deny that the statement is true.  For instance, in response to the factual assertion that Barbier "was permitted to adopt a flexible schedule, as requested," Barbier responded that he "objects to the accuracy of this statement because his department worked on [sic] flexible schedule."  (Pl. 56.1 ¶ 12.) The fact that Barbier's department worked on a flexible schedule and that Barbier was permitted to adopt a flexible schedule as requested, are not inconsistent, and the latter does not detract from the truth of the former.  Accordingly, there is no genuine dispute. In all instances where Barbier "objects to the accuracy" of a statement, the Court has assessed whether the fact asserted is genuinely disputed.

more.  (Pl. 56.1 ¶ 33; Gitlin Decl. Ex. 3 at ECF 4 (Ritter testimony about Barbier's phone calls).)  Ritter observed Barbier using his personal cellphone for personal calls (Gitlin Decl. Ex. 3 at ECF 4), although she was not aware of the nature of those calls (*id*. Ex. 7 at ECF 9, Tr. 32:10-14.)

## C.    Barbier's Job Performance

In July 2019, Ritter met with Barbier to discuss job goals and the need for Barbier to "understand as much as possible about each of the operations, procedure, [and] process."  (Gitlin Decl. Ex. 2 at ECF 101, Tr. 100:3-13.)  The Government asserts that, despite the accommodations and training received, Barbier performed poorly and disrupted his co-workers (itself a violation of company policy).  The Government points to evidence that Barbier lacked basic familiarity with Census Bureau operations and procedures and struggled to follow instructions; consistently failed to monitor his work email, causing him to miss emails, team calls, time-sensitive information, and deadlines;[5] struggled to absorb required materials and to focus on his assignments, including by spending time browsing the internet during work hours; needed constant attention and assistance from his co-workers; and even with that attention and assistance, generated work product that did not meet Census Bureau expectations.  (Pl. 56.1 ¶¶ 24-29.)  He also asked numerous questions of his employees to such an extent that one of his colleagues commented that Barbier was disturbing the workplace.  (Gitlin Decl. Ex. 2 at ECF 108, Tr. 107:13-108:16.)  Barbier does not counter the Government's evidence-based assertions, other than citing his own deposition testimony that he was still suffering

---

[5] Barbier admits that he overlooked emails and attributed his doing so to the lack of receiving "pop up" notifications.  (Gitlin Decl. Ex. 1 at ECF 8.)

the after effects of his injury and that his lack of concentration and "lack of speed" were due to pain. (Pl. 56.1 ¶¶ 24-29; *see also* Def. 56.1 Resp. ¶ 68 (citing Barbier testimony that his injury affected his concentration and prevented him from "focusing intently on things for a while, to learn, absorb, analyze everything").)

On August 5, 2019, Ritter met with Barbier to discuss his performance. (Pl. 56.1 ¶ 36; *see* Gitlin Decl. Ex. 8 at ECF 9-10 (email exchange reflecting meeting took place).) In a follow-up email, with the subject "Points of improvement", Ritter listed "improvements" that Barbier had "agreed to make." (Gitlin Decl. Ex. 8 at ECF 10-11.) The list included directives not to take personal phone calls at his desk; keep small talk (not related to work matters) with coworkers to a minimum; regularly check his email (at least once every 30 minutes); and to focus on the task to be done more than on finding an alternative way to accomplish the task (a reference to Barbier's concern with efficiency of the department's software). (*Id.*) Barbier responded, "acknowledg[ing the] points of improvement." (*Id.* at ECF 9.)

Despite Ritter's counseling, and despite efforts Barbier says he took to improve (*see* Gitlin Decl. Ex. 2 at ECF 112, Tr. 111:15-113:9), Barbier continued to underperform. Over the course of the next month, Ritter repeatedly observed that Barbier was easily distracted, prone to disrupt others, and "unable to be self-directed." (Pl. 56.1 ¶ 38.) Barbier could not answer "basic questions" about his role and was unable "to provide satisfactory customer service to [state and local government] partners." (*Id.* ¶ 39.) His work "contained inaccurate information and was unclear and hard to follow," and

"[Barbier] indicated that he did not have a thorough understanding of critical Census programs."[6]  (*Id*. ¶ 40.)

For example, on August 13, 2019, Barbier "demonstrated he does not monitor his email box," when he was "unaware" he had received an important email requesting confirmation of training for issuance of a government travel card.  (Gitlin Decl. Ex. 8 at ECF 2.)  The following day, Ritter stopped by Barbier's desk because he was having a lengthy conversation with another geographer.  During the conversation, Ritter "found out the task [he had been given by her] was not going to be completed by the deadline, which was the end of the business day," but Barbier had not given Ritter appropriate notice. During the same conversation, Ritter asked Barbier basic questions about his job that he could not answer.  (*Id*. at ECF 2.)  On August 15, 2019, Barbier did not call into a regularly scheduled weekly call; instead "he was doing something on Wells Fargo's website."  (*Id*.

---

[6] The support for the factual statements of the foregoing and following paragraph cited by the Government is based on notes made by Ritter.  (*See* Gitlin Decl. Ex. 8 at ECF 2-5.) Ritter synthesized the notes from other notes she took contemporaneously with the events as they occurred.  (*See* Gitlin Decl. Ex. 7 at ECF 8, Tr. 28:6-13.)  Barbier objects to the asserted statements of material facts based on Ritter's notes "because it is inadmissible hearsay, in that it is the statement of other persons other than the declarant." (Pl. 56.1 ¶¶ 38-40.)  That objection is overruled in part and sustained in part.  Ritter made the notes and can testify about the notes.  *See Okoroafor v. City of New York*, No. 07-CV-9387, 2013 WL 5462284, at *2 n.3 (S.D.N.Y. Sept. 25, 2013) ("notes are admissible hearsay as a present-sense impression under Rule 803(1) ... where the note describes an event personally perceived by the declarant and which is made contemporaneously or immediately after the event described").  That includes what other people told her (to the extent such statements are contained in the notes), although those statements are accepted only for the fact that Ritter was informed of the information provided, not for the truth of that information, except that, to the extent the statements are attributed to Barbier, they are fully admissible as party admissions.  *See Rodriguez v. Modern Handling Equipment of NJ, Inc.*, 604 F. Supp.2d 612, 622 (S.D.N.Y. 2009) (admitting agency report, including interview with plaintiff, which would constitute double hearsay but "since plaintiff is a party to the lawsuit … his statements in the … report … may come in as a non-hearsay party admission").

at ECF 3.)  The same day, Ritter observed that Barbier continued to have lengthy discussions with staff "to a point where it is disrupting others' work" and that he continued to take personal phone calls at his desk rather than the breakroom or hallway.  (*Id.*)  On August 19, 2019, Barbier's responses to example questions from government partners demonstrated he still did not have a basic understanding of the relevant programs.  (*Id.*)  Then, on August 20, 2019, Barbier was asked to draft a response to an inquiry from a program participant.  Barbier's draft and Ritter's discussion with him about it indicated that Barbier was not able "to read and synthesize program guides/instructions."  Even Barbier's second draft still used "unclear and incorrect terminology."  (*Id.*)  A similar incident took place on August 29 and September 4, 2019.  (*Id.* at ECF 5.)

D.    **Barbier's Termination**

On August 20, 2019, having "not seen any improvement" in Barbier's work, Ritter began to "pursue the next steps for terminating" Barbier.  (Pl. 56.1 ¶ 41.)  On September 11, 2019, Ritter and another Census Bureau employee met with Barbier and terminated his employment because of unacceptable conduct and performance."  (*Id.* ¶ 42.)  Ritter provided Barbier with a memorandum of termination.  The memorandum referenced the August 5, 2019 meeting with Barbier in which Ritter met with him "to discuss [Ritter's] concerns regarding [Barbier] taking personal calls at [his] desk; engaging in communication with geography and RCC staff to an extent it was disruptive to others; [and] failure to monitor and promptly respond to emails and Skype chats from [Ritter] and other RCC staff members."  (Gitlin Decl. Ex. 10 at ECF 2.)  The memorandum also noted Barbier's agreement to make improvements and the confirmatory email Ritter sent that same day.  (*Id.*)  The memorandum recounted specific incidents from August 13 and 15,

2019, including failing to monitor email, holding a lengthy conversation with other employees, failing to call into the weekly call while being observed on the Internet, and taking a personal call at his desk. (*Id*.) And, the memorandum recapped the incident of August 20 regarding Barbier's lack of understanding the relevant reference guides and inability to communicate instructions clearly. (*Id*.)

Near the end of his deposition, Barbier was asked "why do you think you were terminated from the Census Bureau?" Barbier answered, "For lack of performance." When then asked what he meant by that, Barbier responded, "That I've been unable to step up to [Ritter]'s expectation within the almost … two and a half months." (Gitlin Decl. Ex. 2 at ECF 116, Tr. 115:17-23.)

## PROCEDURAL BACKGROUND

After his termination, Barbier filed a complaint with the Government's Equal Employment Opportunity ("EEO") office. (Pl. 56.1 ¶ 48.) An investigation took place between March 13 and July 17, 2020, and both Barbier and Ritter submitted sworn testimony. (*See* Gitlin Decl. Exs. 1, 3, 5.) Barbier then filed a complaint with the United States Equal Employment Opportunity Commission (the "EEOC"). (Pl. 56.1 ¶ 53.)

The EEOC evaluated whether Barbier was terminated based on his disability and, on July 19, 2022, granted the Government's motion for summary judgment. (*Id*. ¶ 54; Gitlin Decl. Ex. 12 at ECF 2, 8-9.) In its decision, the EEOC found the record "devoid of a nexus" between Barbier's disability and termination; that there was "no indication that Barbier needed a disability accommodation above what his working conditions already provided him;" that Barbier was afforded a reasonable accommodation; that Barbier was not able to perform the essential functions of his job notwithstanding the shoulder injury;

and that "undisputed materials show that Barbier's termination was the result of deficient performance," including "failure to answer or respond to emails or skype chats, submission of untimely assignments, engagement in personal calls at his desk and disruptive conversations with his coworkers unrelated to work."[7]  (Pl. 56.1 ¶¶ 55-57; Gitlin Decl. Ex. 12 at ECF 8-9.)

Barbier commenced the instant lawsuit on October 24, 2022.  (Dkt. 1.)  The operative complaint is the Second Amended Complaint filed on May 11, 2023.  (Dkt. 27.) On June 15, 2023, the parties consented to my jurisdiction for all purposes.  (Dkt. 33.) Discovery ended as of March 28, 2024.  (*See* Dkt. 41.)  On May 20, 2024, the Government filed the instant motion for summary judgment.  (Dkt. 47.)  Barbier filed an opposing brief on June 11, 2024 (Dkt. 53).  The Government filed its reply brief on July 8, 2024.[8]  (Dkt. 54.)  The motion is fully briefed and ripe for adjudication.

## LEGAL STANDARD

To obtain summary judgment under Federal Rule of Civil Procedure 56, the movant must show that there is no genuine dispute of material fact.  Fed. R. Civ. P. 56(a). The Court may grant summary judgment "only if no reasonable trier of fact could find in favor of the nonmoving party."  *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995);

---

[7] Barbier objects to the EEOC decision as hearsay.  (Pl. 56.1 ¶¶ 54-57.)  That objection is sustained insofar as the Court does not accept the content of the decision for the truth of the matters asserted; however, the Court takes judicial notice of the decision and the outcome.  Regardless, the EEOC decision does not enter into the Court's analysis of the merits of Barbier's claims.

[8] The Court uses the following conventions to refer to the parties' primary briefs.  "Def. Mem." refers to Memorandum Of Law In Support Of The Government's Motion For Summary Judgment.  (Dkt. 48.)  "Pl. Opp." refers to Plaintiff's Memorandum Of Law In Opposition To Summary Judgment.  (Dkt. 53.)

accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11 (1986).  Conversely, "[s]ummary judgment is improper if the evidence is such that a reasonable jury could return a verdict for a nonmoving party."  *Banks v. General Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023) (internal quotation marks omitted).

The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986).  The moving party may demonstrate the absence of a genuine issue of material fact "in either of two ways:  (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim."  *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

The opposing party must then come forward with specific evidence establishing the existence of a genuine dispute; conclusory statements or mere allegations are not sufficient to defeat summary judgment.  *Anderson*, 477 U.S. at 248; *accord Geyer v. Choinski*, 262 F. App'x 318, 318 (2d Cir. 2008) (summary order).  Where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted.  *Celotex*, 477 U.S. at 322; *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016); *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (finding that, if there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper).

In assessing the record to determine whether there is a genuine issue of material fact, the Court must "eschew credibility assessments," *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016) (internal quotation marks omitted), and resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

## DISCUSSION

Barbier asserts two claims under the Rehabilitation Act:  failure to accommodate the disability arising from his shoulder injury, and disparate treatment in having been terminated due to his disability.  Based on the undisputed facts, however, Barbier cannot prove essential elements of his prima facie case under either claim, and, additionally, there is no proof that Barbier was terminated because of his disability.  The Government therefore is entitled to summary judgment.

## I.

## FAILURE TO ACCOMMODATE

The undisputed facts demonstrate that Barbier cannot establish two essential elements of his failure-to-accommodate claim:  (1) that he was qualified for his job, whether with or without reasonable accommodations, and (2) that he did not receive reasonable accommodations.

### A.    Failure To Accommodate Under Section 504 Of The Rehabilitation Act

"Section 504 of the Rehabilitation Act … prohibits discrimination on the basis of disability in employment decisions by the Federal Government." *Lane v. Pena*, 518 U.S. 187, 193, 116 S.Ct. 2092, 2097 (1996).  The Act provides that "[n]o otherwise qualified

individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under" any covered program or activity.  29 U.S.C.A. § 794.  "In short, the Rehabilitation Act … prohibit[s] discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations."  *Powell v. National Board of Medical Examiners*, 364 F.3d 79, 85 (2d Cir.), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004).

"To establish a prima facie case of discrimination based on an employer's failure to accommodate a disability, … a plaintiff must demonstrate that "(1) the plaintiff is a person with a disability …; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019) (internal quotation marks and brackets omitted) (citing *McBride v. BIC Consumer Products Manufacturing Co.*, 583 F.3d 92, 97 (2d Cir. 2009)).  "After this prima facie case is established, an employer can defeat such a claim if it shows (1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue."  *Quadir v. New York State Department of Labor*, No. 13-CV-3327, 2016 WL 3633406, at *2 (S.D.N.Y. June 29, 2016) (internal quotation marks omitted) (citing, *inter alia*, *Borkowski v. Valley Central School District*, 63 F.3d 131, 138 (2d Cir. 1995)), *aff'd*, 691 F. App'x 674 (2d Cir. 2017).  "[F]ailure-to-accommodate claims do not require proof

13

of discriminatory intent." *Brooklyn Center for Psychotherapy, Inc. v. Philadelphia Indemnity Insurance Co.,* 955 F.3d 305, 312 (2d Cir. 2020).

The first two elements of Barbier's prima facie failure-to-accommodate claim are not in dispute on this motion.  The Government does not dispute that Barbier had a disability – namely, limited mobility of his shoulder and accompanying pain – and that the Government was aware of it.  The Government, however, argues that Barbier is unable to establish either that Barbier could perform the essential functions of his job, even with accommodation, or that he did not receive reasonable accommodations.[9]    The Government is correct in both respects.  The Court discusses them in reverse order.

## B.    The Government Provided Barbier With Reasonable Accommodations

There is no genuine dispute that Barbier received reasonable accommodations. "[I]n a case such as this, in which the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is plainly reasonable."    *Noll v. International Business Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015).  "In other words, the plain reasonableness of the existing accommodation ends the analysis."  *Id.*; *see also Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 385 (2d Cir. 1996) ("the accommodations offered by the [defendant] were plainly reasonable.  …  Under these circumstances, we easily affirm the district court's grant of summary judgment").

"A reasonable accommodation is one that 'enable[s] an individual with a disability who is qualified to perform the essential functions of that position ... [or] to enjoy equal

---

[9] Plaintiff is simply wrong in stating that the Government does not contest either the third or fourth element.  (*See* Pl. Opp. at 6.)

benefits and privileges of employment.'" *Noll*, 787 F.3d at 94 (quoting 29 C.F.R. § 1630.2(o)(1)(ii), (iii)).  However, a "reasonable accommodation may take many forms," and employers are not required to provide "a perfect accommodation or the very accommodation most strongly preferred by the employee." *Id*. at 95.  Accordingly, an employee has no right under the Rehabilitation Act to the accommodation of his choice, so long as the accommodation he receives is reasonable. *Fink v. New York City Department of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995).

Here, Barbier requested two accommodations:  (1) a work schedule with flexible hours to enable him to attend medical appointments, and (2) permission to make medical and insurance-related calls at his desk.  With respect to his work schedule, Barbier admits that he was provided with a flexible schedule and that the Government granted his specific requests to attend medical appointments.  (Pl. 56.1 ¶ 51; *see also* Gitlin Decl. Ex. 2 at ECF 75, Tr. 74:17-21 (Barbier agreeing that he "had the flexibility to come and leave as [he] wanted"); *id.* at ECF 78, Tr. 77:3-16, Tr. 79:14-18) (Barbier acknowledging that the Government granted his requests to attend medical appointments).)  There is no genuine dispute that the Government reasonably accommodated Barbier with respect to his work schedule.

Barbier nonetheless argues that because the Government already had a flexible schedule policy in place, and because Ritter did not perceive Barbier's injury to be a "disability," Barbier did not receive reasonable accommodations.  (Pl. Opp. at 10.)  Not so.  The relevant inquiry is not how the employer perceived or characterized an employee's disability, or whether the employer already had accommodation practices in place, but rather whether the employee received a reasonable accommodation.  *See*

*Wernick*, 91 F.3d at 385 (affirming summary judgment in favor of employer where employee received reasonable accommodation even though employer did not concede that plaintiff had a disability); *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002) ("when any reasonable accommodation is provided, the statutory inquiry ends"). Barbier's need for an accommodation to attend medical appointments indisputably was met.

Barbier also argues that the Government did not fulfill its obligations because it did not engage in an "interactive" process with Barbier.  (Pl. Opp. at 10-11.)  That argument too misses the mark.  "Generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."  *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184-85 (2d Cir. 2006) (internal quotation marks and citation omitted).  The Second Circuit has recognized an exception to the general rule in cases of an obvious disability:  "an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious – which is to say, if the employer knew or reasonably should have known that the employee was disabled."  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008); *see also Costabile v. New York City Health & Hospitals Corp.*, 951 F.3d 77, 81 (2d Cir. 2020) (same).

But the Second Circuit has also recognized a "corollary" to the *Brady* exception: an employer has no obligation to engage in an interactive process when it has already provided accommodations that are plainly reasonable.  *Noll*, 787 F.3d at 98 ("Because IBM provided reasonable accommodation to Noll, any failure to engage in an interactive process – even if supported by the record – did not give rise to a discrimination claim").  Thus, the fact that Barbier's sling made his disability obvious is immaterial because the

Government provided reasonable accommodations in response to Barbier's requests. *See Nixon-Tinkelman v. New York City Department of Health and Mental Hygiene*, 434 F. App'x 17, 19 (2d Cir. 2011) (affirming district court's grant of summary judgment to employer on portion of failure-to-accommodate claim where employer granted previous requests for an accommodation, and plaintiff had not requested the additional accommodation he later claimed in litigation should have been provided); *Lievre v. JRM Construction Management, LLC*, No. 17-CV-4439, 2019 WL 4572777, at *12 (S.D.N.Y. Sept. 20, 2019) (granting summary judgment to employer on failure-to-accommodate claim where "every accommodation request that Plaintiff made with respect to [his] cancer treatment was granted," and the plaintiff "failed to identify any reasonable accommodation he was not afforded prior to his termination for poor work performance;" and stating that an employer's "mere awareness of an employee's health issues does not translate into an awareness of that employee's need for additional accommodations").

Barbier also was not denied a reasonable accommodation with respect to his request to take personal calls for medical and insurance purposes.  First, by their very nature, "personal" calls were not related to Barbier's work at the Census Bureau.  Put differently, the accommodation Barbier requested had nothing to do with his ability to perform essential job functions.[10]  *See Noll*, 787 F.3d at 94.  As Barbier's employer, the

---

[10] To the extent taking a personal call at one's desk could be considered a "benefit" or "privilege" of employment, Barbier does not argue that other employees were entitled to take personal calls at their desks while he was not.  Further, Barbier admitted that taking calls at his desk was for his convenience as "it would have relieved the pressure and it would have expedited some [non-work] phone calls which I was kind of reluctant to make" (Gitlin Decl. Ex. 2 at ECF 124, Tr. 123:5-10); and, he conceded that even if he were taking the calls at his desk, he would still be in pain (*id.* at ECF 125, Tr. 124:8-12.).

Government was not required to provide "adjustments or modifications that are primarily for the personal benefit of the individual with a disability." *Hartnett v. Fielding Graduate Institute*, 198 F. App'x 89, 92 (2d Cir. 2006) (summary order); *see also Arzelyant v. B. Manischewitz Co.*, No. 98-CV-2502, 2000 WL 264345, at *8-9 (E.D.N.Y. Jan. 13, 2000) (rejecting failure to accommodate claim because the accommodation sought was to facilitate "making and receiving personal telephone calls" rather than performing any essential job function).

Even if taking personal calls had been essential to Barbier's essential job functions, the Government provided a reasonable accommodation. Specifically, it permitted Barbier to make and take personal phone calls, although not at his desk. That accommodation was "plainly reasonable" given that allowing personal calls to be taken at his desk had disturbed other employees, who were just several feet away in an open-plan bullpen. Although Barbier may have preferred to take calls at his desk, the Government was not obligated to honor that request. *See Noll*, 787 F.3d at 94; *Fink*, 53 F.3d at 567.

In short, the Government fully accommodated the one request by Barbier related to his ability to perform the essential functions of his job – a flexible schedule and permission to leave during the work day for medical appointments. And, even though Barbier's other request – to engage in personal phone calls – was not related to his ability to perform the essential functions of his job, the Government reasonably accommodated the request by allowing Barbier to do so but in a manner that did not disturb the employees around him. Barbier thus has no viable claim that the Government denied him reasonable accommodations.

## C.    Barbier Could Not Perform The Essential Functions Of His Job

"[I]n the context of an employment discrimination claim … [,] an individual is otherwise qualified for a job if she is able to perform the essential functions of that job, either with or without a reasonable accommodation."  *Borkowski*, 63 F.3d at 135; *Sista v. CDC Ixis North America, Inc.*, No. 02-CV-3470, 2005 WL 356973, at *5 (S.D.N.Y. Feb. 15, 2005) ("Plaintiff is not otherwise qualified unless he is able, with or without assistance, to perform the essential functions of the job in question").  The disability laws, however, do "not prevent an employer from holding an employee accountable for poor job performance."  *Jacobson v. Capital One Financial Corp.*, No. 26-CV-6169, 2018 WL 6817064, at *16 (S.D.N.Y. Dec. 12, 2018) (collecting cases).  "Even if a plaintiff's unacceptable job performance is caused by his disability, an employer may still 'hold a disabled employee to legitimate performance expectations, as long as the employee has the same opportunity to succeed as nondisabled employees do.'"  *Lievre*, 2019 WL 4572777, at *12 (quoting *Jacobson*, 2018 WL 6817064, at *16).  The plaintiff bears the burden of proving either that he can meet the requirements of the job without assistance, or that an accommodation exists that permits him to perform the job's essential functions. *Borkowski*, 63 F.3d at 137-38.  Barbier cannot meet that burden.

"Although courts are deferential to an employer's judgment regarding what functions are essential to a particular position, the question involves 'a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice.'"  *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 469 (2d Cir. 2019) (quoting *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 229 (2d Cir. 2017)).  While no one factor is dispositive, relevant factors courts consider include the employer's judgment, written job

descriptions, the amount of time spent on the job, the consequences of not requiring the employee to perform the function, the mention of the function in a collective bargaining agreement, the work experience of past employees, and the work experience of current employees. *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (citing ADA regulations at 29 C.F.R. § 1630.2(n)).[11]

Many of those factors are not relevant here. There is no written job description before the Court, no collective bargaining agreement, and no evidence of the work experience of past employees. As for comparators, there is no evidence of the performance of other Geographers, other than Barbier's interaction with them. And, although Barbier worked for the Census Bureau several years earlier, the roles he played were not similar to that of Geographer. (Gitlin Decl. Ex. 2 at ECF 43:8-10.) Regardless, the record indisputably shows that Barbier was not able to carry out the essential functions of his job, with or without accommodations. As explained above, Barbier received reasonable accommodations, both with respect to being able to attend all medical related appointments and with respect to being able to take and make personal calls related to

---

[11] The terms common to both the ADA and the Rehabilitation Act are to be interpreted in the same way. *Stone*, 118 F.3d at 96. Accordingly, the Court cites cases applying both the ADA and the Rehabilitation Act. *See also* 42 U.S.C. § 12117(b) (federal agencies administering federal disability statutes are to avoid subjecting employment discrimination claims to "inconsistent or conflicting standards"); *Dean v. University at Buffalo School of Medical & Biomedical Sciences*, 804 F.3d 178, 187 (2d Cir. 2015) ("As the standards for actions under these provisions of the ADA and the Rehabilitation Act are generally equivalent, we analyze such claims together"); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) ("[a]lthough there are subtle differences between these disability acts, the standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of federally assisted programs and activities. … Indeed, unless one of those subtle distinctions is pertinent to a particular case, we treat claims under the two statutes identically") (internal citations omitted).

medical and insurance issues.  Even so, Barbier could not effectively perform the core functions of his job.

Barbier was unable to grasp the basic concepts of the Geographer role.  (*See* Pl. 56.1 ¶ 25; Gitlin Decl. Ex. 8 at ECF 3-4, 6-7; Gitlin Decl. Ex. 7 at Tr. 14:21-15:6.)  Barbier concedes that it was difficult for him to "focus" and to "absorb the materials required to be a Geographer."  (Gitlin Decl. Ex. 2 at ECF 103, Tr. 102:11-25; *see also id.* at ECF 62, Tr. 61:16-20 (Barbier testifying that his injury "prevented" him from "focusing intently on things for a while, to learn, absorb, analyze everything").)  Documentation supporting Barbier's termination noted that "despite training and guidance from [Ritter] and other geographers, [Barbier was] unable to understand the complexities of the geography partnership programs."  (Gitlin Decl. Ex. 8 at ECF 6-7.)  *See Shepheard v. New York City Correctional Department*, 360 F. App'x 249, 250-51 (2d Cir. 2010) (affirming summary judgment dismissing claim of disability discrimination where plaintiff "suffered from symptoms that, inter alia, compromised her ability to be focused and alert"); *Powell*, 364 F.3d at 87 (affirming grant of summary judgment because plaintiff, "in her own words, described the difficulties she experiences with basic memory function, vision, and reading comprehension in general" and "failed to carry her burden to demonstrate she was otherwise qualified, as she needed to in order to establish her prima facie case and move forward to trial").  And, when asked why he believes he was terminated, Barbier answered without qualification that it was "[f]or lack of performance."  (Gitlin Decl. Ex. 2 at ECF 116, Tr. 115:17-23.).

The one respect in which Barbier did not receive the specific accommodation he requested is that although he could take personal calls, he had to do so away from his

desk to avoid disrupting his colleagues who worked nearby in the open bullpen. But even if Barbier had been permitted to take personal calls at his desk (which would have been disruptive and not reasonable), his doing so would have had no nexus to his performance issues. Barbier does not argue otherwise. And he has not put forth any evidence that he could perform the essential functions of his job if he had been allowed to take personal calls at his desk. Accordingly, the Government has demonstrated beyond dispute that Barbier was not able to perform the essential functions of his job.[12] The Government is therefore entitled to summary judgment on Barbier's failure-to-accommodate claim.

## II.

## WRONGFUL TERMINATION

The Government similarly is entitled to summary judgment on Barbier's claim for wrongful termination. That is both because Barbier has not adduced sufficient evidence to establish a prima facie case of discriminatory treatment, and because there is no evidence to show that Barbier was discharged for anything other than legitimate non-discriminatory reasons – poor performance and disruptive behavior.

Claims alleging disability discrimination are assessed under the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817

---

[12] The Government also argues that Barbier could not perform the essential functions of his job because he disrupted other employees in violation of workplace policy by making personal calls at his desk and engaging them in prolonged conversation. (*See* Def. Mem. at 12-13.) The Court agrees, as discussed below, that Barbier's repeated disruption of the workplace is a legitimate, non-discriminatory basis for dismissal, but the Court does not base its "essential functions" determination on that ground. *See Krasner v. City of New York*, No. 11-CV-2048, 2013 WL 5338558, at *12 (S.D.N.Y. Sept. 23, 2013) (granting summary judgment against claim of disability discrimination and stating that "the law does not require an employer to tolerate misconduct simply because an employee is suffering from a disability"), *aff'd*, 580 F. App'x 1 (2d Cir. 2014).

(1973).  *See McBride*, 583 F.3d at 96.  Under that analysis, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  *Id*.  To establish a prima facie case, a plaintiff must show that "(1) his employer is subject to the [Rehabilitation Act]; (2) he was disabled within the meaning of the [Act]; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  *Sista*, 445 F.3d at 169 (internal citation omitted).

Barbier cannot establish the third and fourth elements of his wrongful termination claim.  The third element requires that he be qualified to perform the essential functions of his job, with or without accommodation.  As discussed above, in the context of his failure-to-accommodate claim which shares the same element, the evidence indisputably demonstrates that Barbier was not qualified, with or without reasonable accommodations.  That alone is fatal to his wrongful termination claim.

Additionally, although Barbier suffered an adverse employment action – termination of his employment – there is no evidence of record to demonstrate that he was terminated because of his disability.  To demonstrate the requisite discriminatory nexus for their prima face case, a plaintiff must adduce evidence supporting the inference that "discriminat[ion] was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision."  *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (emphasis omitted).  The necessary inference may be derived from a variety of "circumstances, including but not limited to, the employer's

criticism of the plaintiff's performance in degrading terms [concerning the protected characteristic]; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (internal quotation marks and citation omitted); *see also Gallo v. Prudential Residential Services, Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination").

The record is devoid of direct or indirect evidence supporting an inference of discrimination. Barbier has not identified any invidious or degrading comments, either orally or in writing, about his or others' disabilities made during his employment or in conjunction with his termination. Nor has Barbier suggested any other similarly situated non-disabled employees received any different or better treatment than him. And, no reasonable juror could find that the sequence of events raises an inference of discrimination. The Census Bureau provided Barbier with reasonable accommodations from the outset of his employment. Ritter provided guidance and training for Barbier. Ritter met with Barbier to discuss his poor performance, and Barbier "acknowledge[d] [Ritter's] points of improvement." (Gitlin Decl. Ex. 8 at ECF 9.) But during the ensuring two weeks, Barbier's performance did not improve, and he continued to engage in conduct he had expressly been told was not permissible (i.e., taking personal calls at his desk). (Gitlin Decl. Ex. 8 at ECF 2-3 (describing events from August 5-20, 2019); *id.* Ex. 2 at ECF 106, Tr. 105:11-22) (Barbier admitting that he continued to take some personal

calls at his desk).)   The only reasonable inference to be drawn is that Barbier was terminated for poor performance and his continued disruption of the workplace, not because of his disability.

For similar reasons, there is no evidence to genuinely dispute the Government's legitimate, nondiscriminatory reasons for ending Barbier's employment.   The arguments that Barbier raises to the contrary do not survive scrutiny.   First, Barbier, citing to *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 847 (2d Cir. 2013), asserts that summary judgment should be denied "because of the defendant's shifting reason for ending the plaintiff's employment."[13]   (Pl. Opp. at 11.)   That mischaracterizes the record.   Barbier does not cite any evidentiary support for his "shifting reasons" argument.   Nor could he; the Government's stated reasons for terminating Barbier have consistently concerned his performance and disruptions, including by continuing to take personal phone calls at his desk.   (*See, e.g.*, Gitlin Decl. Ex. 1 at ECF 9-11 (EEO investigation); *id.* Ex. 3 at ECF 4-5 (Ritter testimony from EEO investigation); *id.* Ex. 8 at ECF 2-5 (Ritter notes); *id.* Ex. 10 at ECF 2 (termination letter); *id.* Ex. 12 at ECF 5 (EEOC decision).)

Second, Barbier challenges one of Ritter's bases for termination – that Barbier "was constantly making and receiving personal telephone calls" – because Ritter "was uncertain as to whether the discussions were work-related or non-work-related," and because "the source" of Ritter's "information" about the personal nature of Barbier's calls was Barbier's disclosure of such information.   (Pl. Opp. at 13.)   Again, that is not an

---

[13] Barbier cites *Andalax* at the very end of his argument about his failure-to-accommodate claim and just before his discussion of disparate treatment.   The principle he cites it for (employer's shifting reasons for termination), however, is more aptly addressed in the context of his disparate treatment claim.

accurate portrayal of the record.  Ritter testified not that she did not know whether Barbier's calls were work related or not; rather, she testified that she knew Barbier was engaging in personal calls but did not know the nature of those personal calls.  (Gitlin Decl. Ex. 7 at ECF 9, Tr. 32:10-14.)  Ritter also observed Barbier using his personal cell phone in connection with the personal calls he was making.  (Gitlin Decl. Ex. 3 at ECF 4.)  Barbier's argument also is immaterial.  Even if Barbier had learned only from Barbier that he was making personal calls, Barbier concedes he continued to engage in some personal calls at his desk even after Ritter told him not to do so.  (Gitlin Decl. Ex. 2 at ECF 106, Tr. 105:11-22.)

Third, Barbier questions the evidentiary value of Ritter's documentation of the Government's legitimate, non-discriminatory reasons for Barbier's termination, asserting that the "sole documentation of Barbier's poor performance is authored solely by his former supervisor in an informal setting with no formal performance improvement plan." (Pl. Opp. at 14.)  That argument is disingenuous.  Ritter met with Barbier on August 5, 2019, and provided him with a written summary of the "points of improvement" he "agreed to make."  (Gitlin Decl. Ex. 8 at ECF 9-10.)    Barbier affirmatively acknowledged the summary and did not disavow that he had agreed to make those improvements.[14]  (*Id.* at 9.)  Moreover, Barbier does not identify any evidence of record suggesting that Ritter's contemporaneous documentation of Barbier's poor performance, whether before or after

---

[14]  In his response to the Government's statement of undisputed facts, Barbier characterizes the email as a "reprimand for addressing his medically disabling condition," but as support he cites only to factual assertions about the frequency and length of, and disruption caused by, phone calls taken at his desk.  (Pl. 56.1 ¶ 37 (citing as support *id.* ¶¶ 32-35).)  Nothing in the email or the circumstances surrounding it suggest it was retaliatory.

the August 5 meeting with Barbier was either incorrect or pretextual.  *See Natofsky*, 921 F.3d at 351 (granting summary judgment to employer because, among other reasons, "no reasonable factfinder could conclude that the explanation of poor performance proffered by [defendants] was pretextual," namely, an email calling plaintiff "clueless," a negative performance review, and plaintiff's failure to answer staffing and budgetary inquiries).

In sum, the Government has demonstrated the absence of a genuine dispute of material fact with respect to the third and fourth elements of Barbier's wrongful termination claim.

## CONCLUSION

For the foregoing reasons, the Government's motion is granted; summary judgment is awarded in favor of the Government; and the case is dismissed.  To the extent not discussed above, the Court has considered Barbier's arguments and determined them to be either moot or without merit.  The Clerk of Court is directed to enter judgment for the Defendant, terminate all deadlines, and motions and close the case.


SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE


Dated:  December 2, 2024
        New York, New York